1

2

3

4

5

6

7

8
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
9

10   STEVEN PAUL KOZOL,

                                    CASE NO. 2:22-CV-760-MJP-DWC
11               Petitioner,

12        v.                        REPORT AND RECOMMENDATION

13   RON HAYNES,                    Noting Date: August 27, 2025

                Respondent.
14

15        The District Court has referred this action to United States Magistrate Judge David W.

16   Christel. On June 2, 2022, Petitioner Steven Paul Kozol filed his federal habeas petition,

17   pursuant to 28 U.S.C. § 2254, challenging a state court judgment and sentence. Dkt. 1. The Court

18   concludes Petitioner has procedurally defaulted all cognizable grounds for federal habeas relief

19   raised in the Petition and has not made a sufficient showing to overcome his default. Therefore,

20   the undersigned recommends the Petition (Dkt. 1) be denied and a certificate of appealability not

21   be issued.

22

23

24

REPORT AND RECOMMENDATION - 1

# I.    BACKGROUND

**A.    Factual Background**

In 2001, Petitioner was convicted in the King County Superior Court ("the Trial Court") of one count of attempted murder in the first degree, one count burglary in the first degree, and two firearm enhancements. Dkt. 1-1 at 112–119 (Judgment and Sentence in *State v. Kozol,* King County Sup. Ct. No. 00-1-09050-8 KNT (Aug. 3, 2001) (hereinafter "Trial Court")). The Court of Appeals of the State of Washington ("the State Court of Appeals") summarized the facts of Petitioner's case as follows:

Steven Kozol and Thomas Wolter were housemates in Wolter's home from November 1999 to May 2000. Wolter was financially stable, whereas Kozol seldom worked. Kozol owed three months' rent when he moved out of Wolter's home.

Six months later, on November 15, 2000, Wolter was violently attacked in his home by a man wearing a black ski mask over his head and face, leather gloves, and a thick gray sweat suit. Wolter fought his assailant in the upstairs office of his home where the initial attack occurred, then in the stairwell and at the bottom of the stairs, then back upstairs at the doorway to Wolter's bedroom after Wolter ran upstairs and tried to barricade himself in the bedroom and the assailant returned up the stairs and attempted to kick in the door, then back down the stairwell and into the lower part of the house where Wolter was finally able to break away and run to a neighbor's home. In the course of the attack and the ensuing struggle, Wolter was shot with a taser gun, shot three times with a handgun, and threatened with a knife.

Wolter's neighbor called 911. Police arrived quickly but were unable to locate the assailant. Wolter was taken to Harborview Hospital where he was treated for the gunshot wounds and for numerous lacerations requiring stitches. Wolter was not able to identify his assailant, but he was able to describe the clothing worn by the man, and gave police a general description of the man's height, weight, and build. He also told police that when he was shot with the gun he heard a "popping" or "puff" noise, and that the gun seemed to have something long attached to it. This led police to believe that the gun had been equipped with a silencer.

The officers obtained a search warrant to search Wolter's home for evidence. They found no sign of forced entry. They found bloodstains on the carpet and walls, bullets and bullet holes, a wire from a taser gun, a taser barb on the jacket Wolter had been wearing, and "AFIDS" on the floor of the office. The acronym AFIDS stands for "anti-felon identification tags." They are automatically deployed when a taser gun is fired, and they have a serial number on them that can be traced back to a specific taser gun. In this case, the AFIDS were traced to a taser gun that

had been purchased by Wolter's former housemate Steve Kozol, eight days before the attack, from a business called Spy Connection. The physical description Wolter gave police of his attacker was similar to that of Kozol.

The bullets retrieved from the crime scene were found to have been shot from a 9 mm. semi-automatic or fully automatic pistol manufactured by SWD Company. This company imprints the logo "Cobray" on the firearms that it manufactures. Police subsequently found evidence that Kozol had purchased a 9 mm. Cobray handgun and a rapid-fire attachment for the gun.

Because the AFIDS had been traced to a taser gun purchased by Kozol, police promptly began watching him. They saw him transfer a briefcase from his Audi vehicle into the trunk of a Mustang owned by his girlfriend. They obtained multiple search warrants to search Kozol's residence, a storage facility that he rented, his Audi, and his girlfriend's Mustang. In the Mustang, police found a briefcase containing Wolter's identification, several bank statements and blank checks belonging to Wolter, a newspaper article about the attack on Wolter, and a business card from the business called Spy Connection. Wolter subsequently identified the briefcase as one belonging to him.

Police found a book entitled *Quick and Dirty Home Made Silencers* in Kozol's Audi. They also found "smear transfer" bloodstains on the driver's seat of the car. Swabs were taken, tested, and found to exactly match a blood sample taken from Wolter.

In Kozol's garage, police found parts that could be used to make home made silencers for guns using some of the methods described in the book on how to make silencers that was found in Kozol's Audi. Detective Gulla, who helped execute the search warrant for Kozol's garage, subsequently testified that based on his training and experience with firearms and silencers, including actual experience in making a home made silencer, he immediately recognized the parts that he saw in the garage as those from which silencers can be made. He also testified that these parts were located in close proximity to one another.

Kozol was charged with attempted murder in the first degree, and in the alternative, with attempted murder in the second degree. He was also charged with burglary in the first degree. Each of the charges included an allegation that Kozol was armed with a deadly weapon at the time of the crimes.

Kozol brought a motion to suppress evidence obtained from only one of the several search warrants that were issued, the warrant which authorized the search of Kozol's house, garage, and car. The court denied the motion to suppress.

At trial, Kozol testified that although he had indeed purchased a taser gun, a 9 mm. Cobray handgun, and a rapid-fire attachment for the gun, these items had been stolen from his rented storage locker before the night of the crime against Wolter. He testified that he had intended to give the taser gun to his girlfriend for

REPORT AND RECOMMENDATION - 3

Christmas, and that he had intended to use the handgun for target practice. He testified that the blood on his car seat could have come from a rag that he had used to treat a foot injury Wolter received when he stepped on a nail, which rag he had tossed into his car. He testified that Wolter gave him the briefcase, and that because the two had shared the office on the second floor of Wolter's home while they were housemates, Wolter's identification, blank checks, and banks statements, which predated the crime by several months, could have been accidentally swept into the briefcase when Kozol moved out. He denied any involvement in the attack on Wolter. Both he and his girlfriend testified that on the night of the attack, Kozol had been with the girlfriend at her home the whole time. Kozol explained that the parts in his garage were for his hobby of building homemade rockets and for a business project of developing a new kind of air filter for diesel trucks. He also claimed to be writing a novel that included spies and taser guns.

Wolter testified during rebuttal that he had no recollection of injuring his foot by stepping on a nail, or of giving Kozol his briefcase, but that the happening of either event was in the realm of possibility.

The jury found Kozol guilty of attempted first degree murder and first degree burglary, and also found that he had been armed with a deadly weapon at the time of each offense. Kozol was sentenced within the standard range.

Dkt. 1-1 at 95–98 (Unpublished Opinion in *State v. Kozol*, Wash. Ct. App. No. 49154-7-I (June 30, 2003)).

**B.    Procedural Background**

1. *Direct Appeal*

Following his 2001 jury conviction, Petitioner raised the following claims on direct appeal: (1) the Trial Court's failure to suppress evidence obtained pursuant to an allegedly defective warrant; (2) the prosecutor's failure to elect between alternative charges of attempted first- and second-degree murder, allegedly causing jury confusion; (3) ineffective assistance of trial counsel based on the failure to preserve and test blood evidence; (4) a defective jury instruction concerning the elements of attempted first-degree murder; and (5) additional *pro se* claims challenging the search warrant and trial counsel's performance. Dkt. 1-1 at 94–110

1    (Unpublished Opinion in *State v. Kozol*, Wash. Ct. App. No. 49154-7-I (June 30, 2003)). The

2    State Court of Appeals found no reversible error and affirmed Petitioner's conviction. *Id.*

3          Petitioner then sought discretionary review before the Washington State Supreme Court

4    ("the State Supreme Court"), raising six claims: (1) the definition of "attempt" provided in the

5    jury instructions lessened the prosecution's burden of proof in violation of due process; (2) the

6    State Court of Appeals incorrectly concluded that any erroneous instructions had been cured; (3)

7    the affidavit supporting the search warrant failed to establish a nexus between the alleged

8    criminal activity and the locations searched, violating the Fourth Amendment; (4) the search

9    warrant lacked particularity also in violation of the Fourth Amendment; (5) the Trial Court

10   improperly admitted evidence not covered by the warrant under the plain view doctrine in

11   violation of the Fourth Amendment; and (6) that he was entitled to review of his Fourth

12   Amendment claims because they raised significant questions of federal constitutional law. *See*

13   Dkt. 26-2 at 244–45 (Report and Recommendation in *Kozol v. Payne*, No. 2:06-cv-01074-MJP

14   (W.D. Wash. May 4, 2007) (hereinafter "2006 Petition") (summarizing procedural background

15   for Petitioner's conviction and sentence and citing to locally filed state court record)).[1] On

16   February 4, 2004, the State Supreme Court denied review without comment. Dkt. 1-1 at 92

17   (Denial of Review in *State v. Kozol*, Wash. Sup. Ct. No.74329-1 (Feb. 4, 2004)).

18

19

20   ---

    [1] Respondent did not submit a state court record as required under Rule 5 of the Rules Governing Section
21   2254 Cases in the United States District Courts and was given multiple extensions of time to facilitate compliance.
     Dkt. 29, 31, 33, 35 (Orders granting Respondent's first, second, third, and fourth motions to extend deadline to file
22   answer and state court record). Instead, for the state court record Respondent relies on documentation provided by
     Petitioner, which includes a copy of this Court's prior summary of Petitioner's state court proceedings in the 2006
     Petition which does not include a copy of his petition for review on direct appeal. Because the parties do not dispute
23   the issues raised by Petitioner in the state courts and because requiring Respondent to file a state court record would
     delay in these proceedings, the Court cites to the documentation provided by Petitioner and admonishes
24   Respondent's Counsel for failure to fulfill this obligation.

1

2.   *State Collateral Review (Initiated February 2005)*

2       On February 16, 2005, Kozol filed a motion for relief from judgment in the Trial Court,

3    which was transferred to the State Court of Appeals for consideration as Petitioner's first

4    personal restraint petition ("the 2005 PRP"). *See* Dkt. 26-2 at 245 (Report and Recommendation

5    in 2006 Petition); *Id.* at 561–62 (Ruling Denying Review in *In re Personal Restraint of Steven*

6    *Kozol,* Wash. Sup. Ct. No. 78226-1 (Apr. 5, 2006)). The 2005 PRP raised the following grounds:

7    (1) the State presented false testimony through Detective Denny Gulla; (2) ineffective assistance

8    of counsel; (3) prosecutorial misconduct; and (4) miscalculation of his offender score. *Id.* at 231–

9    38 (Order Dismissing Personal Restraint Petition in *In re Personal Restraint of Steven Kozol*,

10   Wash. Ct. App. No. 55747-5-I (Dec. 30, 2005)). The Court of Appeals dismissed the 2005 PRP

11   on December 30, 2005, concluding that Petitioner failed to show that his proceedings in the Trial

12   Court were affected by a constitutional error resulting in actual and substantial prejudice or a

13   non-constitutional error amounting to a fundamental miscarriage of justice. *Id.*

14       Petitioner then petitioned the State Supreme Court for discretionary review, asserting the

15   following grounds: (1) that the appellate court erred in deeming his arguments frivolous; (2) that

16   the State violated due process by knowingly presenting false testimony; (3) that his counsel was

17   ineffective for failing to challenge this evidence, cross-examine witnesses, or present defense

18   evidence; (4) that his Sixth Amendment right to an impartial jury was violated by the inclusion

19   of three biased jurors; (5) that trial counsel was ineffective for failing to challenge those jurors;

20   and (6) that cumulative errors deprived him of a fair trial. *See id.* at 246 (Report and

21   Recommendation in 2006 Petition); *id.* at 561–62 (Ruling Denying Review in *In re Personal*

22   *Restraint of Steven Kozol,* Wash. Sup. Ct. No. 78226-1 (Apr. 5, 2006)). The State Supreme Court

23   denied discretionary review on April 5, 2006, and later denied Petitioner's motion to modify that

24

1  decision on June 2, 2006. *See id.*; *id.* at 239 (Order in *In re Personal Restraint of Steven Kozol,*

2  Wash. Sup. Ct. No. 78226-1 (Jun. 2, 2006)); *id.* at 229 (Certificate of Finality in *In re Personal*

3  *Restraint of Steven Kozol*, Washington Court of Appeals No. 55747-5-I (Jul. 12, 2006)).

4      3.  *Federal Habeas Proceedings (Initiated July 2006)*

5      In 2006, Petitioner filed a federal habeas petition ("the 2006 Petition") raising the

6  following grounds for relief: (1) fabrication of physical evidence by law enforcement in violation

7  of due process; (2) the State's use of false testimony from Det. Gulla violated due process; (3)

8  ineffective assistance of trial counsel for failing to challenge that testimony; (4) failure by the

9  State to disclose exculpatory evidence, such as evidence of Det. Gulla's professional misconduct;

10  (5) cumulative error; (6) denial of the right to an impartial jury; and (7) ineffective assistance of

11  trial counsel for not challenging biased jurors. Dkt. 26-2 at 246–47 (Report and

12  Recommendation in 2006 Petition).

13      The Court dismissed the 2006 Petition with prejudice, concluding that grounds (1), (4),

14  and (5) were unexhausted and procedurally defaulted and that the remaining grounds lacked

15  merit. *Id.* at 247–65 (Report and Recommendation in 2006 Petition); *id.* at 266–75 (Order

16  Adopting Report and Recommendation and Denying Habeas Petition in 2006 Petition); *see also*

17  *id.* at 276–80 (Order Denying Petitioner's Motion to Alter or Amend Judgment in 2006 Petition).

18  Petitioner then sought a certificate of appealability on all grounds raised in the 2006 Petition,

19  which the Court granted. *Id.* at 281 (Order Granting Motion for Certificate of Appealability in

20  2006 Petition).

21      Petitioner proceeded with four claims on appeal, and, on May 5, 2009, the Ninth Circuit

22  affirmed this Court's denial of habeas relief, concluding: (1) that any alleged false testimony by

23  Detective Gulla did not affect the verdict in light of other "overwhelming" evidence supporting

24

Petitioner's conviction; (2) that Petitioner was not prejudiced by trial counsel's alleged

deficiencies; (3) that the due process claim based on allegedly undisclosed evidence was

procedurally defaulted; and (4) that the cumulative error claim failed because Petitioner had not

demonstrated particular constitutional errors. *Id.* at 286–90 (Memorandum Decision in *Kozol v.*

*Payne*, No. 08-35094 (9th Cir. May 5, 2009) (unpublished)).

        4.   *Resentencing Proceedings*

        On September 25, 2018, Petitioner filed a motion for resentencing before the Trial Court,

contending the offender score used at his original sentencing was incorrectly calculated. Dkt. 26-

2 at 12–23 (Motion for Resentencing in Trial Court (Sep. 25, 2018). Specifically, Petitioner

argued two 1991 convictions should have "washed out" under a Washington State sentencing

provision that requires non-sexual prior convictions be excluded from the offender score where

such convictions are followed by a five-year crime-free period. *Id.* at 17–18. Petitioner asserted

he was erroneously denied the benefit of this "wash out" provision due to a long-vacated term of

incarceration occurring in the five years following the 1991 convictions. *Id.* This error allegedly

increased his offender score from 7 to 9, elevating his sentencing range and resulting in an

excessive sentence. *Id.*

        At the resentencing hearing, the State conceded there was an error in calculation of the

offender scores for Petitioner's original judgment and sentence. Dkt. 40-10 at 9, 13, 69

(Verbatim Report of Proceedings in Trial Court (Nov. 13, 2020)). The Trial Court granted

Petitioner's motion, resentencing him under the correct offender score and new standard

sentencing ranges. *Id.* at 72–77. The Trial Court then vacated Petitioner's original judgment and

sentence and issued a new judgment and sentence on resentencing on November 1, 2020. *Id.* at

23–24 (Ex. 4, Order Vacating Original Judgment in Trial Court (Nov. 13, 2020)); *Id.* at 10–21

1   (Ex. 3, Judgment and Sentence on Resentencing in Trial Court (Nov. 13, 2020)). The Trial Court

2   subsequently entered an order correcting typographical errors in the offender score and

3   sentencing ranges reflected on the new judgment and sentence and stating that all other terms

4   and conditions remained in full force and effect. *Id.* at 7–8 (Ex. 2, Order Amending Judgment

5   and Sentence on Resentencing in Trial Court (Jan. 25, 2021)). In sum, the Trial Court reduced

6   Petitioner's total term of confinement from 479 months to 390 months. *Compare id.* at 112–119

7   (Judgment and Sentence in Trial Court (Aug. 3, 2001)) *with id.* at 7–8 (Ex. 2, Order Amending

8   Judgment and Sentence on Resentencing in Trial Court (Jan. 25, 2021)).

9          Petitioner initially filed an appeal on other aspects of the Trial Court's decision but later

10   voluntarily dismiss that appeal. Dkt. 39-1 at 3–5 (Notice of Appeal in Trial Court (Dec. 7,

11   2020)); Dkt. 26-2 at 292 (Ruling Dismissing Appeal in *State v. Kozol,* Wash. Ct. App. No.

12   82282-2-I (Jun. 8, 2021)). The State Court of Appeals issued its mandate on June 8, 2021. *Id.* at

13   293 (Mandate in *State v. Kozol,* Wash. Ct. App. No. 82282-2-I (Jun. 8, 2021)).

14          5.   *State Collateral Review (Initiated June 2022)*

15          On June 1, 2022, Petitioner filed a PRP ("the 2022 PRP") in the State Court of Appeals

16   asserting the following grounds: (1) prosecutorial misconduct, (2) erroneous evidentiary rulings

17   regarding a "silencer manual,"  (3) newly discovered evidence and/or *Brady* violations

18   concerning Detective Gulla's professional misconduct, (4) destruction of exculpatory evidence,

19   (5) ineffective assistance of trial and appellate counsel, and (6) denial of access to the courts.

20   Dkt. 3-1 (Personal Restraint Petition in *In re Personal Restraint of Steven Kozol*, Wash. Ct. App.

21   No. 84098-3-I (Jun. 1, 2022)).

22          The State Court of Appeals dismissed all but one ground asserted in the 2022 PRP as

23   untimely and barred under Wash. Rev. Code § 10.73.090, which requires that PRPs be filed

24

1   within one year after a facially valid judgment and sentence becomes final. Dkt. 26-5

2   (Unpublished Opinion in *In re Personal Restraint of Steven Kozol*, Wash. Ct. App. No. 84098-3-

3   I (Apr. 1, 2024)). The State Court of Appeals concluded that because grounds (1) through (5)

4   concerned valid aspects of Petitioner's original judgment and sentence, the new judgment and

5   sentence on resentencing did not reset the clock on his ability to obtain state collateral review of

6   those claims. *Id.* at 7–12 ("Kozol's timeliness argument fails because none of his challenges to

7   his convictions relate to the invalidity of the 2001 [judgment and sentence]."). It further

8   concluded that Petitioner was not entitled to equitable tolling and was not exempt from the

9   limitations period on actual innocence grounds. *Id.* at 12–17 ("[B]ecause Kozol's proffered new

10  evidence does not show that it is more likely than not that no reasonable juror would have found

11  him guilty, the actual innocence doctrine does not allow him to avoid the one-year time limit

12  prescribed by RCW 10.73.090."). Finally, the State Court of Appeals concluded Petitioner's

13  access to courts claim in ground (6) was without merit and did not preclude dismissal of the 2022

14  PRP as untimely and barred. *Id.* at 17–20.

15       Petitioner then sought discretionary review of the State Court of Appeals decision. Dkt.

16  39-3 at 35–110 (Motion for Discretionary Review in *In re the Personal Restraint of Steven*

17  *Kozol*, Wash. Sup. Ct. No. 103015-1 (Apr. 30, 2024)). The State Supreme Court commissioner

18  denied review, concluding the State Court of Appeals did not err in finding that the 2022 PRP

19  was untimely and barred under Washington state law. Dkt. 26-6 (Ruling Denying Review in *In*

20  *re the Personal Restraint of Steven Kozol*, Wash. Sup. Ct. No. 103015-1 (Jun. 17, 2024)). The

21  commissioner noted that, though the 2022 PRP raised "at least one ground for relief that is

22  potentially exempt from the time limit," it was "at best" a mixed petition and still properly

23  dismissed as untimely under Washington law. *Id.* at 2 (citing *In re Pers. Restraint of Hankerson*,

24

149 Wn.2d 695, 702, 72 P.3d 703 (2003)). Petitioner then filed a motion to modify, and the State

Supreme Court declined to modify the commissioner's ruling. Dkt. 39-3 at 1–33 (Motion to

Modify Commissioner's Ruling in *In re the Personal Restraint of Steven Kozol*, Wash. Sup. Ct.

No. 103015-1 (Jun. 24, 2024)); Dkt. 26-7 (Order in *In re the Personal Restraint of Steven Kozol*,

Wash. Sup. Ct. No. 103015-1 (Sep. 4, 2024)).

That State Court of Appeals issued the certificate of finality on September 25, 2024, and

Petitioner did not seek further review by the United States Supreme Court. Dkt. 26-8 (Certificate

of Finality in *In re Personal Restraint of Steven Kozol*, Wash. Ct. App. No. 84098-3-I (Sep. 25,

2024)).

      6.  *Federal Habeas Proceedings (June 2022)*

In this federal habeas petition, filed on June 2, 2022, Petitioner asserts the following

grounds:

1. Prosecutorial Misconduct During Closing Argument in Violation of the Sixth and Fourteenth Amendments to the United States Constitution ("Ground One")
2. Admission of Improper Evidence—"Silencer Manual"—in Violation of the First and Fourteenth Amendment ("Ground Two")
3. Suppression of Material Impeachment Evidence involving Detective Gulla's Professional Misconduct in Violation of the Fourteenth Amendment as Established in *Brady v. Maryland*, 373 U.S. 83 (1963) ("Ground Three")
4. Destruction of Potentially Exculpatory Evidence in Violation of the Fourteenth Amendment ("Ground Four")
5. Ineffective Assistance of Trial and Appellate Counsel in Violation of the Sixth and Fourteenth Amendments ("Ground Five")
6. Denial of Access to the Courts in Violation of the First, Fifth, and Fourteenth Amendments ("Ground Six")

Dkt. 1 at 5–11, 20–21. Petitioner also moved for a stay of these proceedings so he could attempt

to exhaust his state court remedies. Dkt. 3.

On July 29, 2022, the Court directed Respondent (1) to address whether the Petition

should be deemed second or successive to the 2006 Petition and (2) to respond to Petitioner's

1    request for a stay. Dkt. 5, at 1–2. Respondent responded that the Petition was not "second or

2    successive" within the meaning of 28 U.S.C. § 2244(b) because the judgment and sentence on

3    resentencing constituted a "new, intervening judgment" under *Magwood v. Patterson*, 561 U.S.

4    320 (2010). Dkt. 8 at 1–4. Respondent also agreed to a stay so that Petitioner may attempt to

5    exhaust his remedies in the state court. *Id.* at 4. The Court entered a stay on September 9, 2022.

6    Dkt. 9.

7            On October 23, 2024, the Court lifted the stay in this action and entered an agreed case

8    schedule. Dkt. 22; *see* Dkt. 21 (Stipulated Motion to Lift Stay and Set Schedule). On December

9    24, 2024, Petitioner filed a memorandum in support of his Petition. Dkts. 25, 27. Petitioner also

10   filed relevant state court records for his conviction and sentence. *See* Dkt. 1-1, Dkt. 3-1, Dkt. 3-2,

11   Dkts. 26-1 through 26-8, Dkts. 39-1 through 39-3, and Dkts. 40-1 through 40-10. After receiving

12   several extensions of time, Respondent filed his Answer to the Petition on May 2, 2025. Dkt. 36.

13   Petitioner, who also received an extension, filed his Traverse on June 17, 2025. Dkt. 42.

14   Respondent filed a timely Reply, Dkt. 43, and Petitioner subsequently filed a Notice of

15   Supplemental Authority. Dkt. 44.

16           This matter is now fully briefed and ready for the Court's consideration.

17                              **II.   DISCUSSION**

18           Respondent argues the Petition should be denied and this action dismissed for two

19   reasons. He first argues the Petition was filed more than one year after Petitioner's judgment of

20   conviction became final making it untimely under 28 U.S.C. § 2244(d)(1)(A). Dkt. 36 at 13–21.

21   Alternatively, Respondent argues that, except for Ground Six which cannot provide for federal

22   habeas relief, all Grounds raised in the Petition were procedurally defaulted in the state courts.

23   *Id.* at 21–41. In response, Petitioner argues the Petition is timely and, to the extent his claims are

24

1    defaulted, the procedural default is excused by his ability to (1) show cause and prejudice and (2)

2    actual innocence. *See* Dkt. 42.

3    **A.      Statute of Limitations-Timeliness (All Grounds)**

4            Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which is codified

5    at 28 U.S.C. § 2241 *et seq.*, a one-year statute of limitations applies to federal habeas petitions.

6    Section 2244(d)(1)(A) requires a prisoner to file a habeas petition within one year of "the date on

7    which the [state court] judgment [of conviction] became final by the conclusion of direct review

8    or the expiration of the time for seeking such review."

9            "[T]he judgment from which the AEDPA statute of limitations runs is the one pursuant to

10   which the petitioner is incarcerated." *Smith v. Williams*, 871 F.3d 684, 687 (9th Cir. 2017).

11   Where, as here, a petitioner's original judgment has been modified in the state courts, a federal

12   court sitting in habeas review must determine whether such modification resulted in a new,

13   intervening judgment subject to a renewed one-year limitations period. *Id*. at 688.

14           To make this determination, the Ninth Circuit applies the same principles set forth in

15   *Magwood v. Patterson*, concerning second and successive habeas petitions. *Smith*, 871 F.3d at

16   686–88. In *Magwood*, the Supreme Court held that when a new, intervening judgment is

17   entered—such as through modification of the underlying conviction or sentence—a federal

18   habeas petition challenging that new judgment is not considered "second or successive." *Id.* at

19   341–42. The Supreme Court reasoned that the relevant judgment challenged on habeas review is

20   always the one pursuant to which the prisoner is currently held, not an earlier invalidated

21   judgment. *Id.* at 332–33. Thus, where the state court modifies and replaces a prior judgment, the

22   date on which the new, intervening judgment becomes final marks the start of a new one-year

23   limitations period. *See Smith*, 871 F.3d at 688.

24

1    This principle holds irrespective of whether any ground raised in the habeas petition

2   arises from entry of the new judgment itself; that is, a habeas petition filed within one-year of the

3   date a new, intervening judgment becomes final will be timely even if all grounds raised therein

4   could have been raised on a prior judgment. *See Smith*, at 688 ("It is of no moment that [the new

5   judgment] *reinstated* counts on which [the petitioner] had originally been convicted rather than

6   adding *new* counts of conviction.") (emphasis in original); *see also Wentzell v. Neven*, 674 F.3d

7   1124, 1127 (9th Cir. 2012) ("'[W]here a first habeas petition results in an amended judgment, a

8   subsequent petition is not successive,' even if its claims could have been raised in a prior petition

9   or the petitioner 'effectively challenges an unamended component of the judgment.'") (quoting

10  *Johnson v. United States*, 623 F.3d 41, 44 (2d Cir. 2010)).

11   Indeed, applying *Magwood*, the Ninth Circuit has held that a state court's substantive

12  alteration of a sentence—but not the underlying conviction—creates a new, intervening

13  judgment for purposes of federal habeas review. *Gonzalez v. Sherman*, 873 F.3d 763, 769 (9th

14  Cir. 2017) ("The Supreme Court has directed that '[t]he sentence *is* the judgment' in a criminal

15  case…. As such, a change to a defendant's sentence is a change to his judgment." (quoting

16  *Burton v. Stewart*, 549 U.S. 147, 156 (2007) (emphasis in original))). Whether a sentencing

17  action is substantive change resulting in a new judgment is a matter of state law. *See id.* at 769;

18  *Colbert v. Haynes,* 954 F.3d 1232, 1236 (9th Cir. 2020).

19   In Washington, "only sentencing errors stemming from a trial court exceeding its

20  statutory authority render a sentencing judgment invalid." *Id.* (citing *In re Coats*, 173 Wash.2d

21  123, 135 (2011)); *State v. Kilgore*, 167 Wash. 2d 28, 41 (2009) ("[W]hen a sentence has been

22  imposed for which there is no authority in law, the trial court has the power and duty to correct

23  the erroneous sentence.") (internal citations and quotations omitted). With respect to offender

24

REPORT AND RECOMMENDATION - 14

1    scores, resentencing is required—and a new judgment created—where an error in the offender

2    score "affects the applicable sentencing range." *Id.* at 41 (holding an adjusted offender score that

3    did not impact the applicable sentencing range or require the trial court to exercise discretion at

4    resentencing did not result in a new, appealable judgment).

5        By contrast, "[m]ere typographical errors easily corrected would not render a judgment

6    invalid. Similarly, errors in fact such as a date or place would not necessarily render a judgment

7    invalid." *Coats,* 173 Wash. at 135 (citing *In re McKiearnan*, 165 Wash. 2d 777, 783 (2009)).

8    Unlike a mathematical miscalculation impacting the duration and validity of a judgment and

9    sentence, "a scrivener's error carries no legal consequences" as it rectifies only the written record

10    of a judgment and sentence, not the judgment itself. *See Gonzalez*, 873 F.3d at 772 (addressing

11    similar principles of California law).

12        Here, the record shows the total duration of Petitioner's sentence was reduced upon

13    resentencing to correct an error in the calculation of his offender score in his original judgment

14    and sentence. The Trial Court imposed a sentence which encompassed a 479-month term

15    imposed for the attempted murder conviction and a concurrent 221-month term imposed for the

16    burglary conviction, and each of these terms were inclusive of consecutive 60-month firearm

17    enhancements. Dkt. 1-1 at 112–119 (Judgment and Sentence in Trial Court (Aug. 3, 2001)).[2]

18        At the resentencing hearing, the Trial Court concluded that a reduction in Petitioner's

19    total term of confinement was necessitated by the erroneous calculation of his offender score,

20    which affected the applicable sentencing range for his attempted murder conviction:

21

22    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
        [2] A subsection of Petitioner's original judgment and sentence indicates that additional consecutive 60-
23    month terms were imposed for each firearm enhancement, but the sentencing data and final sentence calculation
      show that the firearm enhancements were folded into the concurrent terms imposed for attempted murder and
      burglary. *Id.* at 113, 115. This result is further confirmed by discussions of the original sentence at Petitioner's
24    resentencing hearing. *See, e.g.*, Dkt. 40-10 at 21 (Verbatim Report of Proceedings in Trial Court (Nov. 13, 2020)).

Therefore, the court grants the defendant's motion to the extent that the offender scores are each reduced by two points which, according to the table on the defendant's resentencing memorandum, page 6, -- this is just for the attempted murder in the first degree count -- the resulting offender score would be 7, resulting in a standard range of 253.5 to 337.5 months. And then if you go toward the right on that table under the column for two firearm enhancements, the range there would be 373.5 to 457.5 months if you include the 120 months for the firearm enhancements, which I do here.

For the crime of attempted murder in the first degree, the court amends the prior judgment and sentences Mr. Kozol to a total of 390 months. That would be 270 months under the standard range plus 120 months with the firearm enhancements. All other terms and conditions in the original judgment and sentence form shall remain the same.

Dkt. 40-10 at 72 (Verbatim Report of Proceedings in Trial Court (Nov. 13, 2020)). The State conceded the miscalculated offender score warranted resentencing as it affected the applicable sentencing range for Petitioner's attempted murder conviction. *See, e.g.*, *id.* at 9, 13, 69–73. Even so, because Petitioner's adjusted offender score did not affect the applicable sentencing range for his attempted burglary conviction, the Trial Court left the original 221-month term for that conviction intact. *Id.* at 72–73.

Under the new judgment and sentence on resentencing, Petitioner's total sentence was reduced to 390 months of incarceration, with a 390-month term imposed for attempted murder and a concurrent 221-month term imposed for burglary—both terms again inclusive of the consecutive firearm enhancements. *Id.* at 23–24 (Order Vacating Judgment in Trial Court (Nov. 13, 2020)); *Id.* at 10–21 (Judgment and Sentence on Resentencing in Trial Court (Nov. 13, 2020)); *Id.* at 7–8 (Order Amending Judgment and Sentence on Resentencing in Trial Court (Jan. 25, 2021)) (correcting scrivener's errors in the written record of the judgment and sentence on resentencing).

Here, Petitioner's judgment and sentence on resentencing constitutes a new, intervening judgment under *Magwood* and its progeny. To determine whether a change in a state criminal

1    sentence creates a "new judgment," the Ninth Circuit directs District Courts to look to the

2    applicable state law. *Colbert*, 954 F.3d at 123. Critical to this inquiry is whether the state court

3    action "replaces an invalid sentence with a valid one." *Id.* Because invalidity is a linchpin, the

4    court in *Colbert*, after examining what constitutes an invalid sentence under Washington law,

5    stated that "in Washington, only sentencing errors stemming from a trial court exceeding its

6    statutory authority render a sentence judgment invalid." (citation omitted). *Id.* In Washington,

7    "[a] sentencing court acts without statutory authority under the [Sentencing Reform Act] when it

8    imposes a sentence based upon a miscalculated offender score." *In re Call*, 144 Wash. 2d 315,

9    332, 28 P.3d 709, 718 (2001).

10        At resentencing, the Trial Court agreed with Petitioner that his "washed out" offenses

11    should not have been used to calculate his offender score and determined Petitioner needed to be

12    resentenced. As the Trial Court acted outside its statutory authority when it entered Petitioner's

13    original sentence, his original sentence was invalid and the 2020 judgment is a new, intervening

14    judgment. *See In re Call*, 144 Wash. 3d at 332 (finding the sentence was invalid when the

15    offender score included "washed out" offenses); *State v. Roche*, 75 Wash. App. 500, 513, 878

16    P.2d 497, 504 (1994) ("It is axiomatic that a sentencing court acts without statutory authority

17    when it imposes a sentence based on a miscalculated offender score.").

18        Petitioner's resentencing thus falls squarely within the type of judicial action that gives

19    rise to a new, intervening judgment for purposes of federal habeas review.[3] Accordingly, the

20    one-year limitations period for Petitioner to file his federal habeas Petition began to run at the

21

22

23    ───────────────
          [3] By contrast, the Trial Court's subsequent order correcting a scrivener's error in the judgment and sentence
      on resentencing did not produce new, intervening judgment. Dkt. 1-1 at 7–8 (Order Amending Judgment and
24    Sentence on Resentencing in Trial Court (Jan. 25, 2021)).

1    conclusion of his direct review for his judgment and sentence on resentencing. 28 U.S.C. §
2    2244(d)(1)(A).

3           After Petitioner filed and subsequently dismissed his direct appeal on resentencing, the
4    State Court of Appeals issued its mandate on June 8, 2021. Dkt. 39-1 at 3–5 (Notice of Appeal in
5    Trial Court (Dec. 7, 2020)); Dkt. 26-2 at 292 (Ruling Dismissing Appeal in *State v. Kozol,* Wash.
6    Ct. App. No. 82282-2-I (Jun. 8, 2021)); *Id.* at 293 (Mandate in *State v. Kozol,* Wash. Ct. App.
7    No. 82282-2-I (Jun. 8, 2021)). As such, AEDPA's limitations period began to run the following
8    day on June 9, 2021. *See Patterson v. Stewart*, 251 F.3d 1243, 1245–46 (9th Cir. 2001)
9    (AEDPA's time limits are calculated in accordance with Fed. R. Civ. P. 6(a)). The limitations
10   period then ran uninterrupted for 357 days and was tolled when Petitioner filed the 2022 PRP on
11   June 1, 2022. Dkt. 3-1 (Personal Restraint Petition in *In re Personal Restraint of Steven Kozol*,
12   Wash. Ct. App. No. 84098-3-I (Jun. 1, 2022)); 28 U.S.C. § 2244(d)(2) ("The time during which a
13   properly filed application for State post-conviction or other collateral review with respect to the
14   pertinent judgment or claim is pending shall not be counted toward any period of limitation
15   under this subsection."). Petitioner filed his federal habeas Petition the following day on June 2,
16   2022. *See* Dkt. 1. Because it was filed approximately one week before the one-year limitations
17   period expired, the Court finds the Petition complies Section 2244(d) and should not be
18   dismissed as untimely.

19          Having concluded that the Petition is not time-barred, the Court next turns to
20   Respondent's alternative argument that, except for Ground Six which offers no independent
21   basis for federal habeas relief, Petitioner has procedurally defaulted all Grounds raised in the
22   Petition.

23

24

**B.     Procedural Default (Grounds One through Five)**

Exhaustion and procedural default are related but distinct doctrines governing federal habeas review. "[A] state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." *Picard v. Connor*, 404 U.S. 270, 275 (1971). Exhaustion "refers only to remedies still available at the time of the federal petition" and asks whether the petitioner may still obtain the relief he seeks in the state system. *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *O'Sullivan v. Boerckel*, 526 U.S. 838, 851 (1999) (Stevens, J., dissenting). A petitioner's federal claims will be considered exhausted only after "the state courts [have been afforded] a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary." *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986).

Procedural default, on the other hand, refers to federal claims that cannot, at the time the federal court reviews the habeas petition, receive such consideration in the state courts because of an adequate and independent state procedural rule barring review. *Franklin v. Johnson*, 290 F.3d 1223, 1230–31 (9th Cir. 2002) (citations omitted); *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991); *O'Sullivan*, 526 U.S. at 845. Procedural default precludes the federal courts from reviewing a claim when the state court has, in fact, been presented with the claim but declined to reach the issue for procedural reasons or when it is clear the state court would, if presented with the federal claim, hold the claim procedurally barred. *Franklin*, 290 F.3d at 1230–31 (citations omitted). In other words, if a state procedural rule has or would now preclude the petitioner from raising his claim at the state level, the claim is considered "procedurally defaulted," and the federal courts are barred from reviewing the petition on the merits. *Coleman*, 501 U.S. at 731–32; *O'Sullivan*, 526 U.S. at 845.

1    All Grounds raised in the Petition are exhausted because each was presented to the state

2    courts in the 2022 PRP and pursued through the final level of review. Dkt. 3-1 (Personal

3    Restraint Petition in *In re Personal Restraint of Steven Kozol*, Wash. Ct. App. No. 84098-3-I

4    (Jun. 1, 2022)). Nevertheless, Grounds One through Five are procedurally defaulted because the

5    state courts declined to reach the issues for procedural reasons—namely, that the 2022 PRP was

6    untimely and procedurally barred pursuant to Wash. Rev. Code § 10.73.090. Dkt. 26-5

7    (Unpublished Opinion in *In re Personal Restraint of Steven Kozol*, Wash. Ct. App. No. 84098-3-

8    I (Apr. 1, 2024)); Dkt. 26-6 (Ruling Denying Review in *In re the Personal Restraint of Steven*

9    *Kozol*, Wash. Sup. Ct. No. 103015-1 (Jun. 17, 2024)). The State Court of Appeals expressly

10   declined to consider the federal claims in Grounds One through Five because each was barred by

11   the one-year limitations period on PRPs filed in Washington state courts. Dkt. 26-5 (Unpublished

12   Opinion in *In re Personal Restraint of Steven Kozol*, Wash. Ct. App. No. 84098-3-I (Apr. 1,

13   2024)). The State Supreme Court did not disturb the State Court of Appeals decision, concluding

14   the lower court had not erred in finding the 2022 PRP was untimely and barred by Wash. Rev.

15   Code § 10.73.090. Dkt. 26-6 (Ruling Denying Review in *In re the Personal Restraint of Steven*

16   *Kozol*, Wash. Sup. Ct. No. 103015-1 (Jun. 17, 2024)); Dkt. 26-7 (Order in *In re the Personal*

17   *Restraint of Steven Kozol*, Wash. Sup. Ct. No. 103015-1 (Sep. 4, 2024)).

18   "There is usually no doubt that the decision of a state supreme court rests on an adequate

19   and independent state ground when the court's opinion clearly and expressly states that its

20   decision is based on a state procedural rule." *Morales v. Calderon*, 85 F.3d 1387, 1390 (9th Cir.

21   1996). On more than one occasion, the Ninth Circuit has found Wash. Rev. Code § 10.73.090 to

22   be an independent and adequate state procedural rule. *See Casey v. Moore*, 386 F.3d 896, 920

23   (9th Cir. 2004) ("We have already determined that this time-related procedural statute, Wash.

24

1    Rev. Code § 10.73.090, provides an independent and adequate state ground to bar federal

2    review") (citing *Shumway v. Payne*, 223 F.3d 982, 989 (9th Cir. 2000)); *see also Powell v.*

3    *Lambert*, 357 F.3d 871, 875 (9th Cir. 2004) (observing that "[m]any aspects of Washington's rule

4    concerning time bars for personal restraint petitions are clear, consistently applied, and well-

5    established," but concluding the procedural bar for untimely mixed petitions was not consistently

6    applied before the rule was settled in *In re Stoudmire,* 141 Wash.2d 342, 5 P.3d 1240 (2000)).

7           Petitioner argues this is no longer the case, but he fails to demonstrate that any arguable

8    variation in the application of Wash. Rev. Code § 10.73.090 by the Washington state courts

9    amounts to more than the permissible exercise of discretion in the exceptional case. *See Ortiz v.*

10   *Stewart*, 149 F.3d 923, 932 (9th Cir. 1998) (concluding a habeas petitioner did not place

11   adequacy of state rule in question because the Ninth Circuit had already held the state procedural

12   rule to be consistently applied and the petitioner failed to cite cases demonstrating subsequent

13   inconsistent application), *overruled on other grounds as recognized by Apelt v. Ryan*, 878 F.3d

14   800, 827–28 (9th Cir. 2017); *see also Morales*, 85 F.3d at 1392–93 (explaining that "procedural

15   rules need not be utterly mechanical," and procedural rules will bar federal habeas review so

16   long as judicial discretion is applied "consistently," "within reasonable operating limits," and on

17   a "principled" rather than "*ad hoc*" basis) (citations omitted).

18          Because the state courts expressly applied an adequate and independent state procedural

19   bar to the federal claims in Grounds One through Five, each of these Grounds is procedurally

20   defaulted. *See Williams v. Ryan*, 2019 WL 4750235, at *3 (D. Ariz. Sept. 30, 2019) ("If a state

21   court expressly applied a procedural bar, and that state procedural bar is both independent and

22   adequate, a federal habeas court cannot review the claim on the merits.") (citing *Ylst v.*

23   *Nunnemaker,* 501 U.S. 797, 801 (1991)). Accordingly, Grounds One through Five are barred

24

REPORT AND RECOMMENDATION - 21

1  from federal review unless Petitioner has made a sufficient showing to overcome his procedural

2  default.

3  **C.     Overcoming Procedural Default (Grounds One through Five)**

4  A procedural default will be excused and a petitioner will be entitled to federal habeas

5  corpus review if he "can demonstrate cause for the default and actual prejudice as a result of the

6  alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

7  fundamental miscarriage of justice[.]" *See Boyd v. Thompson*, 147 F.3d 1124, 1126 (9th Cir.

8  1998) (citing *Coleman*, 501 U.S. at 750). To establish "cause," a petitioner must show some

9  objective factor external to the defense prevented him from complying with the state's

10  procedural rule. *Coleman*, 501 U.S. at 753 (citing *Murray v. Carrier,* 477 U.S. 478, 488 (1986)).

11  To show "prejudice," a petitioner "must shoulder the burden of showing, not merely that the

12  errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and

13  substantial disadvantage, infecting his entire trial with error of constitutional dimensions."

14  *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

15  Only in an "extraordinary case" may the habeas court grant the writ without a showing of

16  cause and prejudice to correct a "fundamental miscarriage of justice" where a constitutional

17  violation has resulted in the conviction of a defendant who is actually innocent. *Murray*, 477

18  U.S. at 495–96. "[T]he miscarriage of justice exception is concerned with actual as compared to

19  legal innocence." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (citation omitted).

20  To demonstrate he suffered a fundamental miscarriage of justice, the petitioner must first

21  identify "new reliable evidence" that was not presented at trial, such as "exculpatory scientific

22  evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup v. Delo*, 513

23  U.S. 298, 324 (1995) (observing that "[b]ecause such evidence is obviously unavailable in the

24  vast majority of cases, claims of actual innocence are rarely successful"). Viewing all the

evidence in light of the new reliable evidence, the petitioner must then show "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537 (2006) (citing *Schlup*, 513 U.S. at 327). The standard to establish actual innocence thus requires "a stronger showing than that needed to establish prejudice." *Id.* at 327 (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

Petitioner seeks to overcome his procedural default by demonstrating cause and prejudice as well as actual innocence. Dkt. 42 at 17–25.

### 1. *Cause and Prejudice*

Beginning with Petitioner's arguments regarding cause and prejudice, he contends the alleged destruction and concealment of certain evidence prevented him from presenting Grounds Three and Four in the 2005 PRP and his status as a *pro se* litigant at that time prevented him from presenting Grounds One, Two, and Five. Dkt. 42 at 17–20.

The concealment of material evidence by the government may constitute cause and prejudice for overcoming procedural default. *See, e.g., Strickler v. Greene*, 527 U.S. 263, 264 (1999) ("In this case, cause and prejudice parallel two of the three components of the alleged *Brady* violation itself."). This does not mean, however, that cause exists in every instance where evidence has been suppressed or destroyed; "[r]ather, the state's suppression establishes cause only when it is the *reason* for [a petitioner's] failure to develop facts in state court proceedings." *Henry v. Ryan*, 720 F.3d 1073, 1082 (9th Cir. 2013) (citing *Banks v. Dretke,* 540 U.S. 668, 691 (2004)) (emphasis in original). For example, in *Henry*, the Ninth Circuit found a petitioner who was aware of an alleged *Brady* violation "long before federal habeas proceedings commenced" had not established cause because it was the petitioner's own lack of diligence in pursuing the claim in the state courts, not the alleged suppression of evidence, that caused his default. *Id.* at 1082–83 (observing that a "rule, under which suppression always establishes cause, would

1    permit a defendant who knows of wrongdoing by the state to wait to bring such a claim until he

2    is in front of the judicial forum that he feels would be most sympathetic to his claim").

3        Here, Petitioner has not established cause for his default of Grounds Three and Four

4    because, like the petitioner in *Henry*, he was aware of the alleged suppression and destruction of

5    evidence long before he initiated these proceedings. Significantly, the Ninth Circuit concluded

6    more than fifteen years ago that the alleged suppression of Detective Gulla's disciplinary

7    record—asserted here in Ground Three—did not establish cause for overcoming the procedural

8    default of a similar claim raised in the 2006 Petition, stating the following:

9        > Kozol argues the State's failure to disclose Detective Gulla's past professional
10       > misconduct and the prosecutor's report violated Kozol's due process rights. Kozol
         > obtained the prosecutor's report in either December 2004, or February 2005, and
11       > read of Detective Gulla's past professional misconduct in a newspaper in December
         > 2005. Although Kozol did not learn of this information until well after his direct
12       > appeal concluded, he still could have presented his claim of exculpatory evidence
         > to the Washington Court of Appeals for collateral review under Washington's time-
13       > limit exception for "[n]ewly discovered evidence." RCW 10.73.100(1). He did not
         > do so, and accordingly procedural default bars his argument. RCW 10.73.090; *see*
14       > *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640
         > (1991); *Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004)
15       > (a petitioner must exhaust state remedies before seeking a federal writ of habeas
         > corpus).

16   Dkt. 26-2 at 289–90 (Memorandum Decision in *Kozol v. Payne*, No. 08-35094 (9th Cir. May 5,

17   2009) (unpublished)). The destruction of evidence alleged in Ground Four does not establish

18   cause for the same reason—Petitioner represents that he was aware of the existence and/or

19   destruction of such evidence on or before 2011. Dkt. 25 at 15–17, 39 (Memorandum in Support).

20   Furthermore, records submitted by Petitioner show that, in 2011, he learned it was Detective

21   Gulla who authorized the destruction of some of this evidence. Dkt. 26-2 at 431–36 (Letter from

22   King County Sheriff's Office and Enclosures dated May 10, 2011). Even assuming the evidence

23   in Grounds Three and Four was material to Petitioner's defense and suppressed/destroyed as he

24   alleges, the procedural default of these Grounds resulted from Petitioner's own lack of diligence

REPORT AND RECOMMENDATION - 24

1    in pursuing his claims in the state courts, not some "external objective factor that 'cannot fairly

2    be attributed to him." *See Smith v. Baldwin*, 510 F.3d 1127, 1146 (9th Cir. 2007) (quoting

3    *Manning v. Foster*, 224 F.3d 1129, 1133 (9th Cir. 2000)).

4            Next, the fact that Petitioner proceeded without the assistance of counsel in filing the

5    2005 PRP does not establish cause for his failure to present Grounds One, Two, and Five at that

6    time. *See*, *e.g.*, *Hughes v. Idaho State Board of Corrections,* 800 F.2d 905, 909 (9th Cir.1986)

7    (finding that an illiterate *pro se* petitioner's lack of legal assistance did not amount to cause to

8    excuse a procedural default); *Tacho v. Martinez,* 862 F.2d 1376, 1381 (9th Cir. 1988) (finding

9    that petitioner's arguments concerning his mental health and reliance upon jailhouse lawyers did

10   not constitute cause). Importantly, Petitioner raised a claim of ineffective assistance of trial

11   counsel on direct appeal and, despite his *pro se* status, he also raised such a claim in the 2005

12   PRP; as such, none of the Grounds asserted here fall under the umbrella of the equitable rule

13   established in *Martinez v. Ryan*, 566 U.S. 1 (2012) (failure to raise an ineffective assistance of

14   trial counsel claim at the first opportunity for review in the state courts because of a petitioner's

15   *pro se* status or deficient counsel may constitute cause for procedural default).

16           In sum, Petitioner fails to show some objective factor external to his defense prevented

17   him from complying with Washington State's procedural bar on untimely PRPs. He has thus

18   failed to show cause for overcoming the procedural default of Grounds One through Five. As the

19   cause element is not satisfied, it is unnecessary for the Court to consider whether Petitioner

20   established actual prejudice for overcoming the default. *See Turner v. Jabe*, 58 F.3d 924, 931

21   (4th Cir. 1995) (citing *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982)); *see also Henry*, 720 F.3d

22   at 1083 (concluding claim subject to state procedural bar was procedurally defaulted where

23   petitioner failed to establish cause for the default and without reaching the prejudice prong).

24

2.  *Actual Innocence*

Petitioner also asserts he has overcome his procedural default by demonstrating actual innocence. Dkt. 42 at 20–25. To support this claim, Petitioner identifies the following evidence not presented at trial: (1) a declaration from Petitioner's former neighbor purporting to establish his alibi during the events in question, (2) an anonymous confession letter disclosing non-public facts about the crimes underlying Petitioner's convictions, (3) allegedly suppressed evidence of Det. Gulla's professional misconduct, and (4) evidence that was allegedly destroyed and/or not retained by the State. *Id.*

Petitioner presented this same evidence with the 2022 PRP to invoke the actual innocence exception to Wash. Rev. Code § 10.73.090. Dkt. 3-1 (Personal Restraint Petition in *In re Personal Restraint of Steven Kozol*, Wash. Ct. App. No. 84098-3-I (Jun. 1, 2022)). As with the miscarriage of justice exception for procedural default, Washington State's actual innocence exception requires that a petitioner present "new, reliable evidence" and show "in light of new evidence 'it is more likely than not that no reasonable juror would have found [the defendant] guilty beyond a reasonable doubt.'" *In re Pers. Restraint of Weber*, 175 Wn.2d 247, 258–59 (2012) (quoting *Schlup*, 513 U.S. at 324–29). The Court finds the State Court of Appeals' application of an identical legal standard to Petitioner's evidence persuasive and adopts that court's conclusions detailed below.

First, the State Court of Appeals concluded that the declaration from Petitioner's former neighbor was not reliable evidence of Petitioner's innocence:

> Kozol relies on a 2020 declaration from his former neighbor, Amal Osman, stating she saw and talked to Kozol while he was walking his dog at 10 p.m. on November 15, 2000—the same time the assailant was attacking Wolter. Osman's declaration does not satisfy the probability standard because it is directly contradicted by Kozol's and his girlfriend's trial testimony that they were watching television inside their apartment at 10 p.m. on the night of the attack. Moreover, Kozol never mentioned during his trial testimony that he interacted with Osman on the night of

the attack, even though this fact would have provided him with a crucial alibi defense. The timing of Osman's declaration also undermines its reliability because she signed it almost two decades after purportedly witnessing the events in question. *See State v. Riofta*, 166 Wn.2d 358, 372-73, 209 P.3d 467 (2009) (courts should consider "how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence") (quoting *Schlup*, 513 U.S. at 332).

Dkt. 26-5 at 12–13 (Unpublished Opinion in *In re Personal Restraint of Steven Kozol*, Wash. Ct. App. No. 84098-3-I (Apr. 1, 2024)).

As the State Court of Appeals observed, Ms. Osman's declaration stating he saw Petitioner walking his dog at 10:00 p.m. on the night of the attempted murder and burglary is contradicted by Petitioner's own trial testimony. In particular, Petitioner provided the following account of his typical weeknight routine:

> I would usually arrive to her work, Barrier Volvo, around 6:30 to 6:40, park right in front of the door where her desk was, and wait for her to get off at seven. Then we'd go home. Once a week we would go out and get Mexican food before going home, but every other night we went straight home. We would arrive home, she would shower, I would walk the dog again, and then we would partake in our evening activities, reading playing cards a lot. Then we'd watch TV around ten or 10:30 every single night and we'd watch the same shows. At 10:00 it would be a show called Street Smarts, at 10:00. And then on the same channel, right after that, a show at 10:30 called Change of Heart, which is like a show about peoples' dates and they get on the TV show and argue. And then we put the timer on the television for fifteen minutes on channel 7 and watched the evening news and fell asleep to that with the timer shutting the TV off.

Dkt. 40-7 at 61–62 (Verbatim Report of Proceedings in Trial Court (Apr. 17, 2001)). And, with regard to his activities and whereabouts on the night in question, Petitioner testified:

> We arrived home about 7:30, and Vanessa went in, took her clothes off, changed, you know, showered, got ready to wind down for the evening. I don't recall what we ate, because I usually am not a big dinner eater, I will snack on some carrots or yogurt, something like that. But then I had to go walk the dog again and then we played -- we either played cards or read a book. I was reading two books at the time, I was reading a Tom Clancy book and a John Grisham book, and I know Vanessa did her nails, because she does that every night. She's always, every night, before we go to bed, that's a part of her routine, take her polish off and put the next day's polish. And then we watched TV, starting at 10:00, with those two shows that I already told you about, and then went to bed around eleven.

REPORT AND RECOMMENDATION - 27

*Id.* at 91–92 (Verbatim Report of Proceedings in Trial Court (Apr. 17, 2001)). The sequence of events described in both portions of Petitioner's trial testimony would not place him outside walking his dog at 10:00 p.m. as stated in Ms. Osman's declaration. Dkt. 26-2 at 485–86 (Declaration of Amal Osman). Thus, this new witness account given nearly two decades following Petitioner's conviction is unreliable and does not satisfy the actual innocence standard. *See Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring) (observing that accounts by witnesses purporting to exonerate criminal defendants in the years following their convictions are "an unfortunate although understandable occurrence" and such accounts— particularly those contradicted by the defendant's own statements—must be treated with "a fair degree of skepticism").

Second, with regard to the anonymous confession letter, the State Court of Appeals reached the following conclusions:

> Kozol relies on an anonymous letter signed by "A repenting addict" addressed to the Seattle Post Intelligencer in 2009 in which the author confesses to having committed the crimes for which Kozol was convicted. The author claims that to pay off a debt to a drug dealer, they obtained keys to Kozol's storage unit and Wolter's house from a construction worker, stole Kozol's taser and firearm from his storage unit, and then attacked Wolter with those weapons while burglarizing his house. The author did not reveal their identity because "I'd spend the rest of my life in prison." This letter does not satisfy the probability standard due, in part, to the author's anonymity. *See Riofta*, 166 Wn.2d at 372-73 (we review posttrial affidavits casting blame on third parties with "a fair degree of skepticism") (citing *Herrera v. Collins*, 506 U.S. 390, 423, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) (O'Connor, J., concurring)). Furthermore, it is highly improbable that a stranger would have been given keys to Wolter's house and Kozol's storage unit, stolen the exact weapons used in the attack in the four-day window between when Kozol put the taser in the storage and when the attack occurred, fitted the firearm with a silencer (which Kozol denied owning), and then used Kozol's weapons while burglarizing a house that happened to belong to Kozol's ex-roommate Wolter.

Dkt. 26-5 at 13–14 (Unpublished Opinion in *In re Personal Restraint of Steven Kozol*, Wash. Ct. App. No. 84098-3-I (Apr. 1, 2024)).

1    Petitioner disagrees with this assessment of his evidence, arguing the confession letter is

2    reliable evidence of his innocence because it contained non-public facts about the burglary and

3    attempted murder for which he was convicted. Dkt. 42 at 22. In this way, Petitioner contends the

4    confession letter in his case is similar to the third-party confessions addressed by the Ninth

5    Circuit in *Gable v. Williams*, 49 F.4th 1315, 1330 (9th Cir. 2022) ("Importantly, Crouse's

6    confessions were corroborated by other evidence, including non-public facts about the murder

7    that only a participant to the crime would know.").

8    However, unlike the confessions at issue in *Gable*, the anonymity of the confession letter

9    presented by Petitioner cuts against its reliability. *See* Dkt. 26-2 at 415 (Letter from "Repenting

10   Addict" to the Seattle Post Intelligencer). Explained further, because the letter's author is

11   unknown, the anonymous confession lacks the inherent reliability of self-inculpatory statements

12   made by known declarants. *See Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004) (citing Fed.

13   R. Evid. 804(b)(3) and *Williamson v. United States*, 512 U.S. 594, 599 (1994) ("[R]easonable

14   people, even reasonable people who are not especially honest, tend not to make self-inculpatory

15   statements unless they believe them to be true.").

16   Moreover, there is no evidence excluding Petitioner—who is himself an individual with

17   knowledge of the non-public facts disclosed—as the letter's author. The Trial Court reached a

18   similar conclusion when addressing the anonymous confession letter at Petitioner's resentencing

19   hearing:

20       I don't put much stock in the confession letter. It is completely uncorroborated. It
         contained information that certainly Mr. Kozol would have had access to as well….
21       If there were any kind of corroboration from some other person or party indicating
         that there was someone else who ransacked the storage unit, if there was
22       someone else who may have done this as described in the letter, then maybe I'll put some
         stock in that, but I don't.

23   Dkt. 40-10 at 71 (Verbatim Report of Proceedings in Trial Court (Nov. 13, 2020)).

24

REPORT AND RECOMMENDATION - 29

Therefore, the Court finds the anonymous confession letter is not reliable evidence demonstrating Petitioner's actual innocence. *Compare Gable*, 49 F.4th at 1330 (affirming grant of habeas relief based on state court's exclusion of third-party confession with "strong indicia of reliability") *with Casillas v. Clark*, No. 23-2213, 2025 WL 900430, at *1 (9th Cir. Mar. 25, 2025) (finding no error in state court's exclusion of untrustworthy third-party confession) *and Christian v. Frank*, 595 F.3d 1076, 1085–86 (9th Cir. 2010) (finding no error in state court's exclusion of third-party confessions as incredible because confessions were made to unreliable witnesses and contradicted by the evidence).

Third, with regard to the allegedly suppressed evidence of Det. Gulla's professional misconduct, the State Court of Appeals addressed Detective Gulla's disciplinary record as follows:

> Kozol claims that the State withheld evidence of Det. Gulla's past professional misconduct in violation of its disclosure requirements under the *Brady* rule, which requires prosecutors to disclose any impeachment evidence known to the prosecution that is "material to guilt or punishment." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 565, 397 P.3d 90 (2017) (citing *Strickler v. Greene*, 527 U.S. 263, 280-81, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)). Kozol provides no authority for the proposition that a petitioner may prove an actual innocence claim using evidence of a *Brady* violation. *See In re Pers. Restraint of Campbell*, 27 Wn. App. 2d 251, 264, 533 P.3d 144 (2023) ("If a party provides no citation in support of a proposition, we may assume that counsel, after diligently searching, has found none."). Regardless, none of Det. Gulla's misdeeds had any connection to Kozol's case and would not have changed the outcome of trial given the overwhelming evidence of Kozol's guilt as detailed above. *See Lui*, 188 Wn.2d at 565 (undisclosed evidence is not material if there is only a "mere *possibility*" that it "*might* have helped the defense or *might* have affected the outcome of the trial") (quoting *State v. Kwan Fai Mak*, 105 Wn.2d 692, 704–05, 718 P.2d 407 (1986)).

Dkt. 26-5 at 14 (Unpublished Opinion in *In re Personal Restraint of Steven Kozol*, Wash. Ct. App. No. 84098-3-I (Apr. 1, 2024)).

The lack of connection between Detective Gulla's misconduct and his investigative role in Petitioner's case was discussed in greater detail by the Trial Court at Petitioner's resentencing hearing:

> I understand the points made by Mr. Kozol and his attorney concerning the circumstances of the investigation by Detective Gulla. I did say earlier that the information and record before the court now shows that his conduct in other matters was disgraceful. There are newspaper accounts of his having propositioned underage girls and then trying to cover it up by lying to investigators, of his threatening a man whose wife he was having an affair with. I mean, just despicable conduct. What I did not see was evidence that Detective Gulla lied in court proceedings in which he didn't have a personal stake. I didn't see any evidence he lied in this proceeding, although there's an allegation that he destroyed evidence, the implication being that it was intentional to conceal information. But even that, while that was implied, I didn't see any evidence that that was the case beyond simply destroying evidence because after a certain amount of time, evidence is normally destroyed. Some of that information – there may be other information out there that Detective Gulla did in fact destroy evidence intentionally, but that information is not before the court here.

Dkt. 40-10 at 70–71 (Verbatim Report of Proceedings in Trial Court (Nov. 13, 2020)).

Furthermore, in determining Petitioner had failed to overcome his default by demonstrating prejudice, which requires a lesser showing, the Ninth Circuit concluded that evidence of Detective Gulla's misconduct presented with the 2006 Petition was "overwhelmed by the evidence connecting Kozol with the crimes for which he was convicted." Dkt. 26-2 at 290 (Memorandum Decision in *Kozol v. Payne*, No. 08-35094 (9th Cir. May 5, 2009) (unpublished)). In short, Petitioner fails to persuade why this Court should now find that Detective Gulla's disciplinary records are new, reliable evidence demonstrating his innocence.

Fourth, with regard to evidence was allegedly destroyed and/or not retained by the State, the State Court of Appeals concluded that such evidence did not demonstrate Petitioner's innocence in light of the evidence presented at trial:

> Kozol contends that the state destroyed evidence that he claims, upon further forensic testing, would have proven he did not commit these crimes. This evidence includes the anonymous confessor's letter and envelope, a Rolex watch the

anonymous confessor claims to have left at the crime scene, a hair found in Wolter's office, light bulbs from Wolter's office, shells from the shotgun that Wolter kept behind his bed, and Kozol's Audi. Here too, Kozol cites no authority for the proposition that improper destruction of evidence can be used to establish actual innocence. Additionally, the destroyed evidence had little importance or relevance. The letter, envelope, and light bulbs had already been forensically tested. It is unclear how forensically testing the hair and shotgun shells would have established Kozol's innocence because Wolter's assailant was wearing a ski mask and gloves, which would have prevented him from transmitting hair or fingerprints to the crime scene. An eyewitness saw Kozol driving the Audi on the day of the attack, which directly contradicts his claim that further testing of the vehicle would have proven it was not drivable that day. And [with regard to the anonymous confession letter] it is highly unlikely that a person who was "committing robberies to support [their] drug habit" would wear a valuable watch while burglarizing a house and then point to the watch as "the only thing I can offer to prove I was the one who committed this crime."

Dkt. 26-5 at 14–15 (second alteration in original).

Seeking a different outcome, Petitioner argues that the destruction of potentially exculpatory evidence in his case requires an adverse inference be drawn against Respondent. Dkt. 42 at 23. According to Petitioner, these circumstances entitle him to an inference that forensic testing of the evidence—had it not been destroyed—would have demonstrated his actual innocence as required to overcome his default. *Id.*

In arguing that such an inference should be applied to excuse his procedural default, Petitioner relies on *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993), which concerned the "broad discretionary power" of the district court "to permit a jury to draw an adverse inference from the destruction or spoliation" of evidence in a products liability action, and *Jimerson v. Payne*, 957 F.3d 916, 930 (8th Cir. 2020), which found a habeas petitioner submitted sufficient evidence to establish the bad faith element of a *Youngblood* claim and concluded that, "under the[] particular circumstances" of the case, an adverse inference may be drawn. *Id.* at 23. Petitioner does not cite, nor has the Court found, any authority applying his proposed adverse inference in the context of the actual innocence exception to the procedural default rule.

1    In addition, the record shows Petitioner was not completely deprived of the opportunity to

2    perform forensic testing of evidence allegedly destroyed in bad faith by Defendant Gulla. In

3    particular, Petitioner contends that Detective Gulla authorized the destruction of the anonymous

4    confession letter and a watch uncovered at the crime scene that Petitioner claims to be the Rolex-

5    type watch mentioned in the confession letter. Dkt. 42 at 23; *see also* Dkt. 26-2 at 415 (Letter

6    from "Repenting Addict" to the Seattle Post Intelligencer) (referencing a "blue colored Rolex

7    wristwatch" that was lost and potentially left at the scene of the crime). Petitioner urges that

8    further testing of these items may have demonstrated his innocence, but the anonymous

9    confession letter was subject to forensic testing upon his request in 2009 and no DNA profile or

10   latent prints were identified. Dkt. 26-2 at 423 (Crime Laboratory Reports dated October 2009);

11   *see also* Dkt. 26-2 at 417–22 (email correspondence between Petitioner's former attorney and

12   attorneys at King County Prosecutor's Office regarding forensic testing of confession letter in

13   2009).

14        Further, while a watch found at the crime scene was destroyed before forensic testing was

15   requested or performed, much of the probative value assigned to this watch lies with its relation

16   to the anonymous confession letter and the possibility it could substantiate the existence of the

17   purported third-party confessor. *See* Dkt. 42 at 22–23; *see also* Dkt. 26-2 at 422 (email

18   correspondence from Petitioner's former attorney requesting forensic testing of watch for

19   comparison to confession letter sent in June 2009); *id.* at 430 (Letter from Office of Prosecuting

20   Attorney for King County Re: DNA Test Request dated March 24, 2010); *id.* at 431–32, 434–36

21   (Letter from King County Sheriff's Office and Enclosures Re: Public Disclosure Request dated

22   May 10, 2011). Because forensic testing of the letter revealed no DNA profiles or fingerprints

23   for comparison to the watch, the ability to perform forensic testing of the watch would provide

24

1    little—if any—evidentiary support for Petitioner's actual innocence. Thus, these circumstances

2    further support not adversely inferring that additional forensic testing of evidence allegedly

3    destroyed by Detective Gulla would be probative of Petitioner's innocence.

4        In sum, Petitioner is procedurally barred from raising Grounds One through Five in the

5    state courts and each of these Grounds is procedurally defaulted and barred from federal review.

6    Further, Petitioner has failed to establish cause or actual innocence and has thus failed to

7    overcome the default. For these reasons, the Court recommends Grounds One through Five be

8    denied as procedurally defaulted.

9    **D.    Access to Courts (Ground Six)**

10       Finally, in Ground Six, Petitioner asserts Washington State's bar on untimely PRPs

11   violates his First Amendment right of access to the courts. Dkt. 1 at 21. While presented as an

12   independent ground for federal habeas relief from his state court conviction and sentence,

13   Ground Six is actually a challenge to the collateral review of that conviction and sentence in the

14   state courts. A habeas corpus petition brought pursuant to 28 U.S.C. § 2254 is not the proper

15   forum for such a claim. *Entler v. Washington State Supreme Ct.*, No. 3:09-cv-5451-BHS, 2009

16   WL 3380634, at *1, 3 (W.D. Wash. Oct. 19, 2009). The Ninth Circuit consistently holds that

17   claims challenging post-conviction proceedings in the state courts are not cognizable in habeas

18   corpus proceedings under 28 U.S.C. § 2254 because they do not challenge a petitioner's

19   detention. *Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam); *see also Ortiz v.*

20   *Stewart*, 149 F.3d 923, 939 (9th Cir. 1998) (finding that the post-conviction court's failure to

21   appoint petitioner counsel in his second post-conviction proceedings did not constitute a basis for

22   a federal habeas claim); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997) (stating that

23

24

errors in the post-conviction proceeding were not cognizable in federal habeas corpus

proceedings).

Accordingly, the Court recommends that Ground Six be denied as it is not cognizable in

these federal habeas proceedings.

## III.   EVIDENTIARY HEARING

The decision to hold an evidentiary hearing is committed to the Court's discretion.

*Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is

available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the

state court. *Cullen*, 563 U.S. at 181–82. A hearing is not required if the allegations would not

entitle Petitioner to relief under § 2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the

record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

court is not required to hold an evidentiary hearing." *Id*. The Court finds it is not necessary to

hold an evidentiary hearing in this case because, as discussed in this Report and

Recommendation, Petitioner's Grounds may be resolved on the existing state court record.

## IV.   CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district

court's dismissal of the federal habeas petition only after obtaining a certificate of appealability

(COA) from a district or circuit judge. See 28 U.S.C. § 2253(c). "A certificate of appealability

may issue . . . only if the [petitioner] has made a substantial showing of the denial of a

constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating

that jurists of reason could disagree with the district court's resolution of his constitutional

1    claims or that jurists could conclude the issues presented are adequate to deserve encouragement

2    to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*,

3    529 U.S. 473, 484 (2000)).

4          No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or

5    would conclude the issues presented in the Petition should proceed further. Therefore, the Court

6    concludes Petitioner is not entitled to a certificate of appealability with respect to this case.

7                **V.   CONCLUSION**

8          For the reasons set forth above, the Court concludes Grounds One through Five are

9    procedurally defaulted and Ground Six is not a proper ground for federal habeas relief. In

10   addition, the Court finds an evidentiary hearing is not necessary. Therefore, the Court

11   recommends the Petition (Dkt. 1) be denied, this action be dismissed with prejudice, and a

12   certificate of appealability not be issued.

13         Objections to this Report and Recommendation, if any, should be filed with the Clerk and

14   served upon all parties to this suit not later than **fourteen (14) days** from the date on which this

15   Report and Recommendation is signed. Failure to file objections within the specified time may

16   affect your right to appeal. Objections should be noted for consideration on the District Judge's

17   motions calendar **fourteen (14) days** from the date they are filed. Responses to objections may

18   be filed by **the day before the noting date**. If no timely objections are filed, the matter will be

19   ready for consideration by the District Judge on **August 27, 2025**.

20         Dated this 12th day of August, 2025.

21

22                           David W. Christel

23                           United States Magistrate Judge

24